UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ELLIOT M. HIRSCH,

Plaintiff,

v.

ADINA MILES, LAURIE BEDA, NORMA TAWIL, HESHY TISCHLER, AMBER ADLER, YESHIVA OF FLATBUSH JOEL BRAVERMAN HIGH SCHOOL (YESHIVA OF FLATBUSH LLC), ELISHEVA YARIMI, NOURITE MAIMON, EVE SCABA, SARAH MIZRAHI, YAFAH SUTTON, ELIZABETH KAIREY, ISABELLA KHAIMOV, LAUREN DAGMY, MIRIAM SABZEHROO, RAQUEL SABZEHROO, SARI DANA, SHERRY CHERA HALABI, DALIA OZIEL, DEBORAH SHILOACH, EVA SHAMMAH, THE EDMOND J. SAFRA SYNAGOGUE INC., RABBI ELI J. MANSOUR, ABRAHAM MANOPLA, BETTI MISSRY, ELANA DWECK, MURRAY BETESH, and RABBI YITZCHAK YISRAELI

Defendants.

**CASE NO. 1:22-cv-05011-EK-VMS**

**JOINT MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT, FILED ON JUNE 4, 2023, PURSUANT TO FRCP RULE 12**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........ 1

LEGAL ARGUMENT ........ 1

I. NEW YORK LAW SHOULD APPLY ........ 1

II. THIS COURT LACKS SUBJECT MATTER JURISDICTION OF THE ACTION BECAUSE OF THE MANY RELIGIOUS QUESTIONS IT PRESENTS ........ 1

III. PLAINITFF'S RICO CLAIMS MUST BE DISMISSED ........ 7

IV. THE PROTECTIONS AFFORDED BY THE FIRST AMENDMENT BAR THE ALLEGATIONS WITHIN PLAINTIFF'S FIRST AMENDED COMPLAINT AND AS SUCH IT MUST BE DISMISSED WITH PREJUDICE ........ 14

V. PLAINTIFF'S AMENDED COMPLAINT MUST BE DISMISSED IN TOTAL AS TO THE YESHIVA DEFENDANTS ........ 18

VI. DEFENDANTS RABBI ELI J. MANSOUR AND THE EDMOND J. SAFRA SYNAGOGUE INC. ARE ENTITLED TO DISMISSAL OF ALL CLAIMS AGAINST THEM ........ 19

CONCLUSION ........ 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*, 2023 U.S. LEXIS 2794 (June 30, 2023) ........ 14, 15

*Abdelhak v. Jewish Press Inc.*, 411 N.J. Super. 211, 985 A.2d 197, 2009 N.J. Super. LEXIS 263 (N.J. Super. Ct. App. Div. 2009) ........ 3, 5

*BSA* v. *Dale*, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) ........ 14, 15

*Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909, 2021 U.S. Dist. LEXIS 121314, 2021 WL 2662064 (N.D. Cal 2021) ........ 10

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 1999 U.S. App. LEXIS 18054 (2d Cir. 1999) ........ 11

*Dillon v. City of New York*, 261 AD2d 34, 704 NYS2d 1 (1999) ........ 16

*Edwards v. South Carolina*, 372 U.S. 229 (1963) ........ 15

*Elias v. Rolling Stone LLC*, 872 F.3d 97 (2d Cir. 2017) ........ 16

*Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 U.S. Dist. LEXIS 244703 (S.D.N.Y. 2020) ........ 16

*Gregory v. Chicago*, 394 U.S. 111, 22 L.Ed.2d 134, 89 S.Ct. 946 (1969) ........ 15

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) ........ 5, 15, 16

*Liberman v. Gelstein*, 80 NY2d 429 (1992) ........ 17

*National Socialist Party of America v. Skokie*, 432 U.S. 43, 53 L.Ed.2d 96, 97 S.Ct. 2205 (1977) ........ 16

*Oliver v. Rio Acquisition Partners, LLC*,
2019 U.S. Dist. LEXIS 27769, 2019 WL 801952 (S.D.N.Y. 2019)................................10, 13

*One World, LLC v. Onoufriadis*,
2021 U.S. App. LEXIS 29370, 2021 WL 4452070 (2d Cir. 2021) ...................................9, 10

*Sheridan v. Mariuz*,
2008 U.S. Dist. LEXIS 123409 (S.D.N.Y. 2008).............................................................8, 10

*Sheridan v. Mariuz*, Report and Recommendation adopted,
2009 U.S. Dist. LEXIS 28984, 2009 WL 920431 (S.D.N.Y. 2009)........................................8

*Shuttlesworth v. Birmingham*,
394 U.S. 147, 22 L.Ed. 2d 162, 89 S.Ct. 935 (1969).............................................................16

*Solstein v. Mirra*,
488 F.Supp.3d 86 (SDNY 2020) .........................................................................................17

*Spence v. Washington*,
418 U.S. 405, 41 L.Ed.2d 842, 94 S.Ct. 2727 (1974) ...........................................................16

*Stepanov v. Dow Jones & Co.*,
120 A.D.3d 28, 987 N.Y.S.2d 37 (1st Dep't 2014)................................................................17

*Stromberg v. California*,
283 U.S. 359, 75 L.Ed. 1117, 51 S.Ct. 532 (1931)................................................................16

*Tinker v. Des Moines Independent Community School Dist.*,
393 U.S. 503, 21 L.Ed.2d 731, 89 S.Ct. 733 (1969)...............................................................16

*United States v. Stimler*,
864 F.3d 253 (3d Cir 2017)..........................................................................................2, 3

*Valley Elecs. Ag v. Polis*,
2021 U.S. Dist. LEXIS 168426 (E.D.N.Y. 2021)..................................................................16

*West Virginia Bd. of Ed. v. Barnette*,
319 U.S. 624, 87 L.Ed. 1628, 63 S.Ct. 1178 (1943)...............................................................16

*Williams v. Affinion Grp., LLC*,
889 F.3d 116, 2018 U.S. App. LEXIS 11909, 2018 WL 2090267 (2d Cir. 2018) .........................................................................................................10

**Statutes**

Religious Freedom Restoration Act of 1993 (RFRA),
107 Stat. 1488, 42 U.S.C. 2000bb et seq., ...................................................................2

Racketeer Influenced and Corrupt Organizations Act (RICO), 84 Stat. 941, 18 U.S.C. 1961-1968, et seq. ..........................................1, 7, 8, 9, 10, 11, 12, 14

**Other Authorities**

Federal Rules of Civil Procedure Rule 12 ........................................................................19

*"Chesed, Gevura & Tiferet – Harmonizing Kindness and Strength,"* Moshe Miller, Chabad.org ..........................................................................................................6

## PRELIMINARY STATEMENT

In amplification of the arguments presented in Defendants' joint moving brief seeking to dismiss Plaintiff's June 4, 2023 filed Complaint, Defendants jointly contend that Plaintiff's filed opposition does not present any viable legal or factual arguments to prevent Your Honor from dismissing Plaintiff's Complaint in total with prejudice. Again, from a global perspective, Defendants assert that as the issues and conduct involved herein, at their core, necessitate consideration as to the invocation and application of Judaic religious doctrine, respectfully, this Court lacks subject matter jurisdiction over the matter. Further, the complaint should be dismissed as it takes issue with Defendants' First Amendment protected exercise of their freedom of speech, freedom of religion and associated freedom of assembly. Plaintiff's opposition has also failed to rebut Defendants' arguments as to the non-viability of Plaintiff's RICO allegations. Based on these arguments, as well as those presented herein in reference to specific Defendants and the arguments within the moving brief, Plaintiff's June 4, 2023 Complaint must be dismissed with prejudice.

## LEGAL ARGUMENT

### I. NEW YORK LAW SHOULD APPLY

Plaintiff, as expressed in his opposition, concurs with Defendants that this case should be decided in accordance with New York law.

### II. THIS COURT LACKS SUBJECT MATTER JURISDICTION OF THE ACTION BECAUSE OF THE MANY RELIGIOUS QUESTIONS IT PRESENTS

Defendants maintain that this Court lacks subject matter jurisdiction of the instant case because its adjudication will force the Court and any jury in the matter to become entangled in a thicket of questions concerning arcane religious issues and practices and their appropriate invocation.

As he has done in the past, in opposition to this argument, Plaintiff touts the Third Circuit case of *United States v. Stimler*, 864 F.3d 253 (3d Cir 2017), as dispositive on the question of whether there is lack of subject matter jurisdiction in this case due to the prospect of excessive entanglement with religion. A reading of the decision, however, reveals that it is not relevant in the least to the instant motion. While *Stimler* could be described as a case about how some Orthodox Jews reacted to a man who ostensibly refused to give his wife a "*get*", that is where the similarity to the present case ends. The actual issues dealt with in *Stimler* are worlds away from those before this Court and Plaintiff's argument must be rejected.

The defendants in *Stimler* appealed from criminal convictions of conspiracy to commit kidnapping. An FBI agent had posed as a wife whose husband would not give her a "*get*." After hearing her story, the defendants put together a plan to kidnap and physically torture the fictitious spouse to wring a "*get*" from him. The defendants never raised a defense of lack of jurisdiction based on the possibility of excessive entanglement with religion. Their argument was that the government's decision to prosecute them violated the Religious Freedom Restoration Act (RFRA) by substantially burdening their sincerely held religious beliefs, and because the prosecution was not the least restrictive means of furthering any compelling government interest. The circuit court upheld the rejection of these arguments by the trial court, which found that the government's decision to prosecute the defendants did not substantially burden their religious exercise and that the government had a compelling interest in the uniform prosecution of kidnapping laws.

The instant case is not a criminal prosecution. Absent here is any compelling interest in the uniform prosecution of violent Federal crimes, which was a major concern of the court in *Stimler*. Nor is the RFRA at issue here, as it was in *Stimler*. The Defendants here do not claim that there was any government action in this case that burdens their free exercise of religion. What is at issue

in this civil litigation is the principle that the Establishment Clause bars courts from exercising jurisdiction in cases where resolution of the dispute would result in the entanglement of government with a given religion. Again, entanglement occurs when a court is called upon to resolve disputed issues of religious doctrine and practice, which is precisely what this Court is called upon to do in the instant action, as Defendants explain more fully in their initial moving submissions. *Stimler* is not germane to the present case because, whatever its holding, the question of entanglement played no role in it.

Plaintiff has also badly misconstrued *Abdelhak v. Jewish Press Inc.*, 411 N.J. Super. 211, 985 A.2d 197, 2009 N.J. Super. LEXIS 263 (N.J. Super. Ct. App. Div. 2009), by claiming that the appellate court there failed to state that the entanglement defense alone justified the dismissal of the action. The sole issue in *Abdelhak* was whether the case should be dismissed based on the excess entanglement defense. The court responded affirmatively. The ruling, which is four-square in support of Defendants' position in the instant matter, dismissed the *Abdelhak* lawsuit wholly on the grounds of the entanglement defense. "We are forced here to set the boundary between the secular and the ecclesiastical and, in our view, because plaintiff's claims cannot be resolved without excessive entanglement into religious beliefs, we are left with no alternative other than the dismissal of plaintiff's claims." *Id.* How Plaintiff got the idea that the *Abdelhak* court failed to state that the entanglement defense alone justified the dismissal of the case is a mystery.

To salvage his action from dismissal, Plaintiff tries to persuade this Court that he can prove his causes of action without reference to religious principles. Yet, in the first full paragraph on page 179 of 206 of his opposition submission (p. 7 of Plaintiff's brief), Plaintiff explains how he refers to the "*get*" "concept" and his refusal to provide one to defendant Kairey as "necessary background to comprehend the Defendants' behaviors." That is precisely the point Defendants are making on

the instant motion. This case is so shot through with "necessary" references to religious doctrines that it cannot be adjudicated without immersing the Judge and jury in a host of theological concepts.

In the same paragraph, plaintiff also admits that his goal in the instant lawsuit is to defend Orthodox Judaism by alerting the Court that Defendants' actions are not proper under Orthodox Jewish law. He cannot possibly do this without deep references to Jewish religious law and tradition, since, as pointed out in Defendants' initial motion submissions, there are conflicting Jewish doctrinal views on many of the concepts involved here, such as whether the "use of force" and the nature of such "force" affects the legitimacy of a "*get*," a subject that Plaintiff himself dwells upon in his pleading.

It is not solely Plaintiff's prerogative as to how much religion plays a role in this case. For instance, Plaintiff may try to show that he can make out a case for intentional infliction of emotional distress just by referring to secular criteria such as the import of the word "abuse." But Defendants are entitled to negate the "outrageous and uncivilized behavior" element of this cause of action by showing that they were justifiably reacting to the profound pain Plaintiff was inflicting on his wife by withholding a "*get.*" In doing so Defendants will have to establish how and why Jewish law prohibits the remarriage of women who have been denied a "*get*," and how it scars their future children. Similarly, Defendants are entitled to point to these theological constructs to show that there really was abuse here by Plaintiff, thereby undercutting Plaintiff's defamation allegations based on his unreasonable hyper-technical definition of the term. This does not, as Plaintiff would have it, grant blanket permission for anyone to use religion to justify any misdeeds. On the contrary, Defendants here will be using religious concepts to specifically target precise elements of Plaintiff's causes of action.

Another example of Defendants' need to resort to religious subjects in the defense of this case has to do with Plaintiff's defamation allegations. According to the operative amended complaint (ECF Doc 168 at ¶231; also attached as Ex. F to Counsel's Certification in Support of the Motion to Dismiss), the Defendants' alleged statements that Plaintiff would not "free" his wife and that he was a "*get*" refuser were defamatory. Plaintiff then goes on to allege that this caused him to be vilified in the Orthodox Jewish community. See ECF Doc 168 at ¶238. These allegations are identical to those made by the plaintiff in *Abdelhak*. In analyzing them the court there held that

> As in Klagsbrun, the resolution of plaintiff's defamation claim here would require a court and jury "to delve into religious doctrine," ibid., because the jury would be faced with evaluating whether a claim that plaintiff had refused to provide his wife a Get would expose him to shame and condemnation within the Orthodox Jewish community.

In other words, here, when trying to prove his defamation cause of action, Plaintiff will have to show why refusing to give his wife a "*get*" would, in the words of his operative amended complaint, result in "hatred, contempt, aversion, inducement of an evil or unsavory opinion of me in the minds of a substantial number of people in the Orthodox Jewish communities." ECF Doc 168 at ¶238. Plaintiff cannot accomplish this proof of his damages unless he refers to Jewish religious doctrines and ideals. This is precisely what *Abdelhak* held and the court was clearly correct in finding that it forced an excessive entanglement with religion.

It does not matter that some of Plaintiff's allegations might be susceptible of proof without reference to religious principles. As long as Plaintiff includes in his quiver of allegations those which will oblige the Court and jury to acquire knowledge of Jewish theology, law and practice and apply it to the facts presented, the case as a whole is tainted and must be dismissed. *See*, the *Abdelhak* court's discussion of how the presence of secular elements in that case did not negate the lack of subject matter jurisdiction. Said the court: "Thus, we conclude that neither the secular

nature of the cause of action nor the secular professions of the defendants serve as a per se bar to a finding of a lack of subject matter jurisdiction."

As explained above and in much greater detail in Defendants' initial submissions, religious concepts play much more than a superficial contextual role in this case. They are an integral component of Plaintiff's case and a vital factor in the defenses to it. Nothing shows this better than Plaintiff's cause of action for the return of the "*get*" he gave his wife, defendant Kairey. The document is in the custody of a rabbi. It is extremely unlikely that this rabbi will simply relinquish the "*get*" to Plaintiff just because Plaintiff thinks neutral principles of law control on the issue. This rabbi will undoubtedly resist Plaintiff's attempts to pry the "*get*" from him. He will likely do so on religious grounds as well as secular grounds. Any attempt to force him to surrender the "get" will potentially violate his free exercise of religion. He will have to explain why he simply cannot hand over the "*get*" under Jewish law. This will obviously enmesh the Court in matters of religious doctrine.

Further evident as to integral nature of religion herein is Plaintiff's claims against Defendant Yeshiva of Flatbush which is brought into this spurious litigation based on the allegation that the Yeshiva acknowledged its students "chesed" hours regarding their participation in a protest against those who withhold "gets." Notably, "chesed" means "kindness or benevolence. It denotes the unbounded loving-kindness with which God created the worlds and with which all of creation is permeated, as the verse states, "The world was built with *chesed*" (Psalms 89:3)." *See* "*Chesed, Gevura & Tiferet – Harmonizing Kindness and Strength*," Moshe Miller, Chabad.org. As such, as concerns the Yeshiva, the conduct in question is truly the religious school's invocation of religious doctrine and belief in requiring its students to render charitable "chesed" hours in furtherance of the taught Judaic principles. That certain students – all unnamed and not identified by the Plaintiff

– participated in an expression of their religious beliefs – in the exercise of their protected rights by the First Amendment as to the freedom of speech, freedom of religion and freedom of assembly – concerning the withholding of "gets' – relevant under Judaic law – is the source of Plaintiff's allegations against the Yeshiva, and others. Should the Yeshiva be proscribed from affording chesed hours rendered in furtherance of Judaic and religious principles? Should it be penalized that its students sought to exercise their protected rights? And all because indeed, Plaintiff, like others like him, refused to give his wife a "*get*." All such questions and issues will necessitate the Court to dive deep into religious doctrine and thus is indicative why respectfully, this Court lacks subject matter jurisdiction over this matter.

## III. PLAINITFF'S RICO CLAIMS MUST BE DISMISSED

Nothing in Plaintiff's opposing papers rehabilitates his RICO cause of action. As explained at length in Defendants' initial submissions, Plaintiff's RICO case against the Defendants is a chimera. The operative amended complaint fails to make out even the most fundamental of the many elements of Civil RICO. Nothing in Plaintiff's opposition papers changes this.

Plaintiff insists that his pleading establishes his (alleged) financial loss at the hands of the purported RICO enterprise. He downplays Defendants' position that he cannot claim financial loss because he contributed no money to the charity fund for Kairey and because only one of the many defendants in this case received anything at all from him (a "*get*") as a result of the alleged RICO scheme. Instead, he claims that the "pivotal factor" is that he had to expend legal fees due to Defendants' "fraudulent campaign."

This argument lacks any basis in fact. The operative amended complaint contains no allegation that Plaintiff incurred any legal fees because of any of the alleged RICO activities of any of the defendants. Indeed, he represents himself *pro se* in this litigation. Legal fees that Plaintiff

may have expended in Defendant Kairey's divorce proceedings against him have nothing to do with the facts of the instant case. The operative amended complaint is concerned with Defendants' purported attempts to persuade Plaintiff to give his wife a "*get*." There are no allegations connecting this objective to the civil divorce proceedings. Nor are there any allegations that the purported solicitation of funds for Kairey led to Plaintiff having to pay legal fees in the matrimonial action. There are no facts recited in the operative amended complaint that even imply that the existence or progress of the civil divorce action was tied to the charity fund. Plaintiff's new contention in opposition to the present motion that there was such a connection is speculative in the extreme. He fails to make the necessary showing that the alleged RICO related activities of the Defendants were the proximate cause of plaintiff's expenditure of legal fees. *See, Sheridan v. Mariuz*, 2008 U.S. Dist. LEXIS 123409 (S.D.N.Y. 2008); *Sheridan v. Mariuz - Report and Recommendation adopted*, 2009 U.S. Dist. LEXIS 28984, 2009 WL 920431 (S.D.N.Y. 2009).

Further, the alleged costs to plaintiff of having to drive to New York do not qualify as RICO damages. First of all, such costs are deminimus. Second, the supposed object of the non-existent RICO enterprise was that Plaintiff give his wife a "*get*," not that he must travel to New York to do it. The fact that he allegedly did so is completely incidental to the alleged RICO scheme. Neither Plaintiff's alleged payment of legal fees in connection with the divorce nor his mileage to New York are, as Plaintiff contends, "substantial components" of his case.

As explained in Defendants' initial submissions, Plaintiff's allegations that the solicitation of contributions for the charity fund make out an instance of wire fraud are preposterous given that Plaintiff cannot identify the persons who were allegedly defrauded, cannot state any facts indicating that the contributors relied on the supposed falsity of the statements made on the website, and lack any grounds to even indicate that the alleged falsity of the statements were known

to whoever posted them on the website. (The allegation that whoever did the posting, along with all the other defendants in the case, should have known that the statements were false because they were in contact with Kairey, is too vague and speculative to be acceptable.)

Plaintiff's argument that all the Defendants were "logically … equally" culpable for the wire fraud, when Plaintiff has utterly failed to properly plead wire fraud, and when he has pled no facts tying any of the other Defendants to the charity solicitation, is utterly illogical. Again, indicative of the flaws of Plaintiff's broad brush, but empty, RICO allegations, is how the Yeshiva Defendant is somehow involved in this RICO scheme because it allotted "chesed" hours to some unidentified students for their participation in a protest against those who withhold "*gets*." How this, even if accepted as true, equates to RICO or wire fraud, is absolutely dumbfounding. It simply does not – rather it reveals the desperation of Plaintiff's allegations which Your Honor must dismiss.

Indeed, it is important to note how vague Plaintiff's allegations of defamation and fraud are. He repeatedly alleges, with a broad brush that does not nor cannot apply as to all Defendants, that statements on the website and in connection with the charity fund were false but, except with regard to the alleged "fake lawyer," comment, he never attempts to explain why they are false. The child support allegations are a good example. He keeps stating that he is falsely accused of withholding child support but never once affirmatively states that he did pay child support, and never provides any details of any payments. On the same note, he alleges that statements about his "relentless legal campaign" against Kairey and his appeals of decisions in the divorce case are untrue but never states why they are supposedly untrue. Consequently, such conclusory allegations should not be credited by the Court. *See One World, LLC v. Onoufriadis*, 2021 U.S. App. LEXIS

29370, 2021 WL 4452070 (2d Cir. 2021); *Oliver v. Rio Acquisition Partners, LLC*, 2019 U.S. Dist. LEXIS 27769, 2019 WL 801952 (S.D.N.Y. 2019).

Again, "'RICO claims premised on . . . wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *One World, LLC v. Onoufriadis*, cited, *supra*. A RICO wire fraud plaintiff must plead his cause of action with particularity and must "explain why the [alleged] statements were fraudulent." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 2018 U.S. App. LEXIS 11909, 2018 WL 2090267 (2d Cir. 2018). By withholding all of the details that would show why the alleged statements here were fraudulent, Plaintiff fails to plead another key component of his cause of action.

In the initial submissions on the instant motion, Defendants point out that Plaintiff incurred no financial loss or other detriment because of the allegedly fraudulent charity solicitation on the website, and that this prevents him from citing the solicitation as a RICO predicate. To circumvent the uncontested fact that he himself was never a victim of the purported fraud, Plaintiff cites a case from the Northern District of California (*Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909, 2021 U.S. Dist. LEXIS 121314, 2021 WL 2662064 (N.D. Cal 2021) for the proposition that RICO wire fraud may be established if non-parties were the "targets" of the fraud. To the extent that this is the law in that venue, it is not the law in the Second Circuit. To properly plead a RICO predicate act in this jurisdiction, a plaintiff must satisfy the proximate cause pleading requirement. For instance, in *Sheridan v. Mariuz*, cited, *supra*, a case out of our own E.D.N.Y., the court held that

> This theory that the Plaintiff relies upon — that he suffered injury because of the fraud perpetrated on a non-party to this case — has been discredited by the Supreme Court and the Second Circuit and has been held to be insufficient to establish proximate causation as a matter of law.

Because Plaintiff was not hurt by the alleged charity fraud, he cannot use it as a RICO predicate act. As the Second Circuit observed in *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 1999 U.S. App. LEXIS 18054 (2d Cir. 1999), "To establish a claim for a civil violation of section 1962(c), 'a plaintiff must show that **he was injured** by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" [Emphasis supplied.]

Plaintiff's allegations that there was a RICO conspiracy in this case are wholly contrived. His allegations of "meticulous" planning and organization are not borne out by the actual facts pleaded in the operative amended complaint. As clarified in Defendants' initial submissions, the so-called "Free Elizabeth campaign" was an unformed hodge-podge of individuals who took advantage of a website they had not established to extemporaneously and coincidentally vent their anger at Plaintiff's refusal to give his wife a "*get.*" There is no evidence plead by Plaintiff that there was an agreement amongst the Defendants to commit any acts that would amount to violations of the RICO statutes. The only structure there appears to have been was that someone set and publicized the location and time of the two demonstrations. The so-called conspiracy was nothing more than an ad hoc loose and casual group of people who held strong views on a particular moral subject. Simply put, there was no "agreement" in the RICO conspiracy sense. *See, Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, cited, *supra.*

Notably, Plaintiff accuses Rabbi Mansour of being the mastermind of the non-existent RICO enterprise but, again, the actual allegations of the operative amended complaint against this clergyman do not bear this out. They are all conclusory and based on speculation, assumption, and supposition. Here is an example: Paragraph 163 of the operative amended complaint states that "On March 8, 2021, the free Elizabeth chesed fund campaign was published at the behest and support of Rabbi Eli J. Mansour." No details are given to support this. Plaintiff believes that the

campaign was done at the rabbi's "behest" but he does not fill in any specifics like who the rabbi supposedly spoke to about initiating the publication, when the conversation occurred, or where it took place. The operative amended complaint pleads that the website mentioned that others thought Rabbi Mansour had authorized it, but there is nothing in the pleading that bears this out by citation to actual statements by him. Indeed, Plaintiff almost never points to any statement by the rabbi himself on the platform, just what others said he said. With regard to the statements allegedly made by Rabbi Mansour to defendant Manopla (see, operative amended complaint, ECF Doc 168, ¶¶ 177 – 186) these were made (if at all) after the purported RICO enterprise ceased due to Plaintiff giving his wife a "*get*." Such statements could not have been in furtherance of the alleged conspiracy against plaintiff because its object had already been completely accomplished.

Moreover, in another paragraph of the operative amended complaint (¶167 at ECF Doc 168), Plaintiff's allegations actually contradict his speculation that Rabbi Mansour was the mastermind of the purported campaign to get Plaintiff to free his wife so that according to her religious beliefs she could remarry. Indeed, Plaintiff alleges that "Mansour advised Reisman of his support of the free Elizabeth campaign." So, according to Plaintiff, Mansour allegedly said he **supported** the campaign, not that he organized and directed it. Merely supporting an endeavor is a far cry from being its mastermind.

Plaintiff, in both his opposition and in the operative amended complaint, makes it seem as if the demonstrations he complains about were numerous and frequent. In one place he calls them "ongoing nightly riots." This is hyperbole in its worst form. There were no more than two demonstrations. *See*, ECF Doc 168, ¶ 287. No reasonable person could call them "riots." There is no allegation in the pleading that would support such a designation. There are no allegations of any physical injury to persons or property damage (more on the absence of property damage,

*infra*), and no allegations of any arrests. Plaintiff's repeated insistence that they were un-permitted and illegal is completely speculative, and a legal conclusion, which need not be accepted as true on the instant motion. *See Oliver v. Rio Acquisition Partners, LLC*, cited, *supra*.

Further, Plaintiff's apparent allegations about property damage that supposedly occurred during the demonstrations are amongst the vaguest and most contradictory in the operative amended complaint. To fully understand this, it must be noted that the operative amended complaint mentions property damage to the New York house of a man named Dibo Hafif, who is not a party to the instant action. The operative amended complaint refers, in a few places, to demonstrations at Hafif's house that were held because Hafif denied his own wife a "*get*." At paragraph 288 of the operative amended complaint (ECF Doc 168), Plaintiff alleges that rocks and eggs were thrown at these Hafif demonstrations. By contrast, Plaintiff never makes such an allegation regarding the demonstration at his own, New Jersey, home, although he implies that it occurred. But, in reality, it never did. Plaintiff admits this in his memo in opposition to the instant motion (ECF Doc 195, page 201 of 206) where he states the following: "Additionally, their explicit threat to throw eggs and rocks during the New Jersey protest, mirroring the actions in the New York protests [i.e., the Hafif demonstrations] underscored the deliberate and calculated nature of their actions." Clearly, Plaintiff concedes that no rocks and eggs were thrown at his New Jersey home; there were, allegedly, only threats in this regard. Accordingly, there was no property damage sustained by Plaintiff at either of the two alleged demonstrations against him. (The second demonstration was not even at his home but near his father's medical office (*see* ECF Doc 168, ¶39)). This reinforces the conclusion that the demonstration at the New Jersey home was not illegal, despite Plaintiff's allegations that it was.

Seemingly, alleging civil RICO schemes is a very popular pastime amongst pro se plaintiffs. It is submitted that in most instances, plaintiff's allegations fail to properly plead the case. That is what has happened here and Defendants request that Plaintiff's RICO causes of action be dismissed.

## IV. THE PROTECTIONS AFFORDED BY THE FIRST AMENDMENT BAR THE ALLEGATIONS WITHIN PLAINTIFF'S FIRST AMENDED COMPLAINT, INCLUDING THOSE OF DEFAMATION, AND AS SUCH PLAINTIFF'S ACTION MUST BE DISMISSED WITH PREJUDICE

In furtherance of the arguments presented in Defendants' joint moving brief, Plaintiff's alleged causes of action arise from his objection to Defendants' "global" exercise of their respective rights to exercise their religious beliefs through their rights as to their freedom of speech and assembly in articulating their view concerning the constriction of rights of Jewish women who from whom "*gets*" are withheld therein conscribing and preventing those women from effectuating a divorce pursuant to Jewish Rabbinical doctrine. Defendants refer Your Honor to their discussion as to United States Supreme Court's recent decision in *303 Creative LLC v. Elenis*, 2023 U.S. LEXIS 2794, *19-20 (June 30, 2023) wherein the Supreme Court undertook a detailed analysis of relevant and applicable case law to confirm the far reach of the First Amendment's Free Speech Clause. To that end we highlight the discussion in *Elenis* as to the Framers and the conclusion that the freedom to think and speak is "among our inalienable human rights." *Elenis*, at *19-20 referencing *BSA* v. *Dale*, 530 U.S. 640, 660-661, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) and 4 Annals of Cong. 934 (1794) (Rep. Madison)). The Supreme Court also acknowledged that the First Amendment "protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply 'misguided' and likely to cause 'anguish' or 'incalculable grief.'" *Elenis* at *19-20 (quoting *Hurley v. Irish-American Gay,*

*Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995) and *Snyder* v. *Phelps,* 562 U.S. 443, 456, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011)).

Further particularly relevant to Plaintiff's attack as to the Defendants herein is that our Supreme Court has consistently found that the "First Amendment protects acts of expressive association." ***Elenis***, 2023 US LEXIS 2794, *21-23 (June 30, 2023); see also *Dale*, 530 U.S., at 647-656, 120 S Ct. 2446, 147 L Ed.2d 554; *Hurley*, 515 U.S., at 568-570, 579, 115 S.Ct. 2338, 132 L.Ed.2d 487.

In fact, germane to Plaintiff's allegations here against the Defendants, irrespective of his titular characterization of his alleged cause of action, arising from and based on Defendants expression of their beliefs concerning those who refuse to give "gets", the Supreme Court has long recognized that such forms of expression, when rendered in a "parade" type form, are indeed protected by the First Amendment. In *Hurley*, in addressing the issue as to the participation of a gay, lesbian bisexual group in a St. Patrick's Day march, the Supreme Court reconfirmed such reach of First Amendment protections, noting:

> If there were no reason for a group of people to march from here to there except to reach a destination, they could make the trip without expressing any message beyond the fact of the march itself. Some people might call such a procession a parade, but it would not be much of one. Real "parades are public dramas of social relations, and in them performers define who can be a social actor and what subjects and ideas are available for communication and consideration." S. Davis, Parades and Power: Street Theatre in Nineteenth-Century Philadelphia 6 (1986). Hence, we use the word "parade" to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way. Indeed, a parade's dependence on watchers is so extreme that nowadays, as with Bishop Berkeley's celebrated tree, "if a parade or demonstration receives no media coverage, it may as well not have happened." *Id., at 171*. Parades are thus a form of expression, not just motion, and the inherent expressiveness of marching to make a point explains our cases involving protest marches. In *Gregory v. Chicago, 394 U.S. 111, 112, 22 L.Ed.2d 134, 89 S.Ct. 946 (1969)*, for example, petitioners had taken part in a procession to express their grievances to the city government, and we held that such a "march, if peaceful and orderly, falls well within the sphere of conduct protected by the *First Amendment*." Similarly, in *Edwards v. South Carolina, supra, at 235*, where petitioners had joined in a march of protest and pride, carrying placards and singing The Star Spangled

> Banner, we held that the activities "reflect an exercise of these basic constitutional rights in their most pristine and classic form." Accord, *Shuttlesworth v. Birmingham, 394 U.S. 147, 152, 22 L.Ed. 2d 162, 89 S.Ct. 935 (1969)*.
>
> The protected expression that inheres in a parade is not limited to its banners and songs, however, for the Constitution looks beyond written or spoken words as mediums of expression. Noting that "symbolism is a primitive but effective way of communicating ideas," *West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624, 632, 87 L.Ed. 1628, 63 S.Ct. 1178 (1943)*, our cases have recognized that the *First Amendment* shields such acts as saluting a flag (and refusing to do so), *id., at 632, 642*, wearing an armband to protest a war, *Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 505-506, 21 L.Ed.2d 731, 89 S.Ct. 733 (1969)*, displaying a red flag, *Stromberg v. California, 283 U.S. 359, 369, 75 L.Ed. 1117, 51 S.Ct. 532 (1931)*, and even "marching, walking or parading" in uniforms displaying the swastika, *National Socialist Party of America v. Skokie, 432 U.S. 43, 53 L.Ed.2d 96, 97 S.Ct. 2205 (1977)*. As some of these examples show, a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a "particularized message," cf. *Spence v. Washington, 418 U.S. 405, 411, 41 L.Ed.2d 842, 94 S.Ct. 2727 (1974) (per curiam)*, would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll.

*Hurley*, 515 U.S. 557, at 568-570.

Thus, here, Plaintiff's allegations against Defendants based on Defendants expressing their beliefs and opinions that the withholding of "gets" is abhorrent and in violation of religious beliefs and doctrine, are indeed much like the actions of those who "march in parades," and as such those actions are protected by the First Amendment and thus Plaintiffs' action should be dismissed with prejudice.

Moreover, accordingly, Plaintiff's defamation claims fail. Again, to establish defamation, a plaintiff must prove that (1) the defendant made a false statement, (2) published the statement to a third party without authorization, (3) that the defendant was at least negligent when making the statement, and (4) that the statement caused special harm or constituted "defamation per se." See *Dillon v City of New York*, 261 AD2d 34, 38, 704 NYS2d 1 (1999); *Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 U.S. Dist. LEXIS 244703, *7 (S.D.N.Y. 2020); *see also Valley Elecs. Ag v. Polis*, 2021 U.S. Dist. LEXIS 168426, *17-18 (E.D.N.Y. 2021); *Elias v. Rolling Stone LLC*, 872 F.3d 97,

104 (2d Cir. 2017); *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 987 N.Y.S.2d 37, 41 (1st Dep't 2014). Plaintiff has not met this burden.

While New York courts recognized four types of statements as defamation *per se* including (1) Statements charging a plaintiff with a serious crime; (2) Statements that tend to injure another in their trade, business, or profession; (3) Statements imputing a loathsome disease on a plaintiff; and (4) Statements imputing unchastity on a woman, see *Liberman v. Gelstein*, 80 NY2d 429 (1992), Plaintiff has failed to establish such statements here for his action to survive. While Plaintiff alleges that Defendants "who published and transmitted the free Elizabeth chesed fund webpage…are guilty of libel per se," (Ex. F, ¶ 229), none of the statements fall under the categories as set forth under New York law constituting such a claim.

In this instance, most of the statements on the CheSedFund webpage are about Plaintiff's ex-wife, Elizabeth Kairey and request for assistance and donations for her and her daughter. *See* Ex. F, Exhibit 1. Plaintiff's name is not even mentioned anywhere on the website, much less any statements which accused him of a crime, having a loathsome disease, or which were intended to injure his profession.

Plaintiff's opposition does not alter this circumstance nor does it render his action viable. His reference to *Solstein v. Mirra*, 488 F.Supp.3d 86, 95 (SDNY 2020) and the other cases referred to by him does not alter that the statements at issue here did not fall into the categories considered for defamation and/or libel per se. There is also that undeniable fact that Plaintiff DID withhold the "get" from his wife. That others construed Plaintiff's action to be abhorrent and/or in violation of religious doctrine and principles does not transform Plaintiff's allegations against the Defendants viable. Accordingly, since Plaintiff has not sufficiently demonstrated libel *per se*, and

the statements at issue here do not fall within the gambit of defamation per se, the claim must be dismissed with prejudice.

In sum, referring Your Honor to the Defendants' argument here and as presented in their moving brief wherein Defendants contend that their alleged conduct is protected by the First Amendment – that is their statements and expressions of actions as to their perspective that they disagreed and found the refusal to give a "get" to be in violation with their religious beliefs and religious doctrine, the Defendants request that the Court dismiss this matter with prejudice.

## V. PLAINTIFF'S AMENDED COMPLAINT MUST BE DISMISSED IN TOTAL AS TO THE YESHIVA DEFENDANTS

Even when considering Plaintiff's opposition to the joint motion to dismiss, it is clear that Plaintiff's spurious claims against the Yeshiva Defendants must be dismissed with prejudice. Amplifying the arguments for dismissal in the moving brief, the Yeshiva Defendants again highlight that the Yeshiva is only mentioned in 8 of the 297 paragraphs within Plaintiff's Amended Complaint and these 8 paragraphs only assert that some unidentified and unnamed high school students participated in a March 11, 2021 protest holding up signs that allegedly stated "let her go" and thereafter were awarded chesed community service hours. See Ex. F, ¶77-81. Clearly these limited alleged facts, even if true, do not and cannot establish the legally necessary pled facts to support or establish the basis for Plaintiff's ten asserted causes of action.

In and apart that Plaintiff improperly and baselessly "lumps" the Yeshiva Defendants with all other Defendants and seeks to equate alleged actions and alleged associated culpability amongst all Defendants, irrespective of the truth, much less even the purported facts presented in his Complaint, when considering the actual facts presented by Plaintiff as to the Yeshiva Defendants against the delineated necessary factual elements that must be pled to support and assert the ten alleged causes of action, it is clear that Plaintiff's complaint against the Yeshiva Defendants cannot

survive. Thus, in furtherance of the arguments presented in the moving brief, and in this brief on reply, Plaintiff's action must be dismissed with prejudice as to the Yeshiva Defendants.

## VI. DEFENDANTS RABBI ELI J. MANSOUR AND THE EDMOND J. SAFRA SYNAGOGUE INC. ARE ENTITLED TO DISMISSAL OF ALL CLAIMS AGAINST THEM

As noted in depth above in connection with our anti-RICO argument, and at length in our original submissions, the allegations against Rabbi Mansour and The Synagogue are vague and speculative, based not on their own admissions, statements, and actions but on references to them on the website by others, or simply on plaintiff's assumptions of what they did and said. When discussing these two defendants, particularly Rabbi Mansour, the overwhelming majority of the allegations lack even the most basic details of time, place, and setting and are wholly conclusory. We rest on what we have already said about the infirmities of the operative amended complaint concerning these Defendants, and request that the Court dismiss the Complaint.

## CONCLUSION

**WHEREFORE**, Defendants YESHIVAH OF FLATBUSH and YESHIVA OF FLATBUSH LLC (improperly pled as "YESHIVA OF FLATBLUSH JOEL BRAVERMAN HIGH SCHOOL"), as joined by moving Defendants, including Defendant NOURITE MAIMON, Defendant SARI DANA, Defendant YAFAH SUTTON, Defendant THE EDMOND J. SAFRA SYNAGOGUE INC., and Defendant RABBI ELI J. MANSOUR, all respectfully request that the Court issue an Order dismissing Plaintiff's Amended Complaint with prejudice pursuant to, *inter alia*, Rule 12 of the Federal Rules of Civil Procedure; and for such other and further relief as this Honorable Court may deem just and proper.

Respectfully Submitted,

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**

/s/Joanna Piorek

Joanna Piorek, Esq.
Shirley Karasick, Esq.
7 Giralda Farms
Madison, NJ 07940
Joanna.Piorek@wilsonelser.com
Phone: (973)-624-0800
Facsimile: (973)-624-0808
Our File No. 06729.00445
*Attorneys for Defendants YESHIVAH OF FLATBUSH and YESHIVA OF FLATBUSH LLC (improperly pled as "YESHIVA OF FLATBLUSH JOEL BRAVERMAN HIGH SCHOOL")*

Dated: October 24, 2023